IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Ricardo Longoria, | ) | No. CV 04-521-PHX-JWS (HCE) |
| | ) | |
| Petitioner, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| Ernest Trujillo, et. al., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| | ) | |

Pending before the Court is Petitioner's *pro se* Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.

Pursuant to the Rules of Practice of this Court, this matter was referred to Magistrate Judge Nancy Fiora.  On July 9, 2005, this matter was referred to the undersigned Magistrate Judge in light of Magistrate Judge Fiora's retirement.

For the following reasons, the Magistrate Judge recommends that the District Court deny the Petition.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Petitioner's Conviction and Summary of the Case

On September 29, 2000, Petitioner entered a guilty plea in Arizona state court to felony charges arising from three separate charging documents.  (Answer, p. 2 & Ex. A) Petitioner pled guilty to Theft of Means of Transportation; Armed Robbery; Kidnapping; and Aggravated Assault; and two counts of Escape. (Answer, Ex. A, E)  The trial court sentenced

him to a combination of concurrent and consecutive sentences totaling 29.5 years.[1] (Answer, Ex. B)

**B.  Post-Conviction Proceedings**

On June 4, 2001, Petitioner filed a *pro se* petition for post-conviction relief (hereinafter "PCR Petition").  (Answer, Ex. B)  Petitioner argued that: (1) the sentence imposed exceeded the upper sentencing limit set forth in the plea agreement; (2) the prosecutor coerced him to plead guilty by threatening to charge Petitioner's girlfriend with crimes; and (3) Petitioner was promised that if he signed the plea agreement, he would receive a contact visit with his girlfriend, mother, and brother, however, such visit never occurred.  (Id.)  The trial court summarily denied Petitioner's PCR Petition because the matters were "raisable by direct appeal and/or were raised at" a hearing conducted on May 25, 2001.  (Answer, Ex. D)

Petitioner filed a petition for review with the Arizona Court of Appeals.  (Answer, p.2) On January 8, 2002, the Arizona Court of Appeals held that the trial court did not abuse its discretion by summarily denying Petitioner's claim regarding the length of his sentence; held that the trial court abused its discretion in summarily denying Petitioner's claim that his plea was coerced; vacated the summary denial of Petitioner's coerced-plea claim; and remanded the matter for a determination of whether Petitioner's guilty plea was coerced by threats and unfulfilled promises.  (Answer, Ex. E)

On June 28, 2002, the trial court conducted an evidentiary hearing pursuant to the appellate court's remand order.  (Answer, Ex. F)   At the hearing, Petitioner represented himself.  (Id.) Subsequent to the evidentiary hearing,  the trial court denied Petitioner's PCR Petition.  (Answer, Ex. G)

---

[1]The record reflects that Defendant was initially sentenced on December 19, 2000. (Petition, p. 1) On May 25, 2001, the trial court entered an "Order Clarifying Sentence" indicating that Defendant's incarceration was not to exceed 29.5 years.  (Answer, Ex. B, E)

On October 28, 2003, the Arizona Court of Appeals granted Petitioner's request for review of the trial court's denial of his PCR Petition and denied relief.  (Answer, Ex. H)

### C.  Petitioner's Petition for Writ of Habeas Corpus

On March 16, 2004, Petitioner filed the instant Petition for Writ of Habeas Corpus. Petitioner raises the following claims:

1.      His guilty plea was coerced because the prosecutor threatened to prosecute Petitioner's girlfriend for perjury;

2.      He was improperly induced to accept the plea agreement based upon an oral promise that he would be allowed a "contact visit with Monica Rios" and others (Petition, p.6); and

3.      He was denied the opportunity to adequately prepare for the June 28, 2002 evidentiary hearing because he was not permitted to conduct witness interviews.

On August 13, 2004, Respondents filed their Answer.  Respondents indicate that Petitioner's Petition was timely filed and respond to the merits of Petitioner's claims.

Because Respondents' exhibits included only a portion of transcript of Petitioner's change of plea hearing, the Court ordered Respondents to file the complete transcript of such hearing.  (September 29, 2005 Order) On October 14, 2005, Respondents filed the entire transcript of Petitioner's September 29, 2000 change of plea hearing. (Respondents' October 14, 2005 Notice, Ex.1)

## II.  DISCUSSION

### A.  Standard: Review of Merits

Pursuant to the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), the Court may grant a writ of habeas corpus only if the state court proceeding:

(1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

      (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Section 2254(d)(1) applies to challenges to purely legal questions resolved by the state court and section 2254(d)(2) applies to purely factual questions resolved by the state court.  *Lambert v. Blodgett,* 393 F.3d 943, 978 (9th Cir. 2004), *cert. denied* __ U.S. __, 126 S.Ct. 484 (2005).  Therefore, the question whether a state court erred in applying the law is a different question from whether it erred in determining the facts.  *Rice v. Collins,* __ U.S. __, 126 S.Ct. 969 (2006).

      Section 2254(d)(1) consists of two alternative tests, i.e., the "contrary to" test and the "unreasonable application" test.  *See Cordova v. Baca,* 346 F.3d 924, 929 (9th Cir. 2003).  Under the first test, the state court's "decision is contrary to clearly established federal law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result." *Clark v. Murphy,* 331 F.3d 1062, 1067 (9th Cir. 2003) (citing *Williams v. Taylor,* 529 U.S. 362, 413-414 (2000)).  Additionally, a state court's decision is "'contrary to' Supreme Court case law if the state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases."[2] *Van Lynn v. Farmon,* 347 F.3d 735, 738 (9th Cir. 2003) *cert. denied* 541 U.S. 1037 (2004) (quoting *Early v. Packer,* 537 U.S. 3, 8 (2002)).  "Whether a state court's interpretation of federal law is *contrary* to Supreme Court authority...is a question of federal law as to which [the federal courts]...owe no deference to the state courts."  *Cordova,* 346 F.3d at 929 (emphasis in original)

_____

[2]"[T]he *only* definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams,* 529 U.S. at 412...While circuit law may be 'persuasive authority' for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, *Duhaime v. Ducharme,* 200 F.3d 597, 600-01 (9th Cir.1999), only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark,* 331 F.3d at 1069 (emphasis in original).

(distinguishing deference owed under the "contrary to" test of section (d)(1) with that owed under the "unreasonable application" test).

Under the second test, " '[a] state court's decision involves an unreasonable application of federal law if the state court identifies the correct governing legal principle...but unreasonably applies that principle to the facts of the prisoner's case.'" *Van Lynn*, 347 F.3d at 738 (quoting *Clark,* 331 F.3d at 1067) Under the "'unreasonable application clause...a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly...[r]ather that application must be objectively unreasonable.'" *Clark,* 331 F.3d at 1068 (quoting *Lockyer v. Andrade,* 538 U.S. 63 (2003)). When evaluating whether the state decision amounts to an unreasonable application of federal law, "[f]ederal courts owe substantial deference to state court interpretations of federal law." *Cordova,* 346 F.3d at 929.

Under section 2254(d)(2), which involves purely factual questions resolved by the state court,  "the question on review is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding is supported by the record." *Lambert,*  393 F.3d at 978; *see also Taylor v. Maddox,* 366 F.3d 992, 999 (9th Cir.), *cert. denied* 534 U.S. 1038 (2004) ("a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually  unreasonable.") Section (d)(2) "applies most readily to situations where petitioner challenges the state court's findings based entirely on the state record.  Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence,...that the process employed by the state court is defective,...or that no finding was made by the state court at all." *Taylor,* 366 F.3d at 999 (citations omitted).  In examining the record under section 2254(d)(2), the federal court "must be particularly deferential to our state court colleagues... [M]ere doubt as to the adequacy of the state court's findings of fact is insufficient; 'we must be satisfied that *any* appellate court to whom the

defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.'" *Lambert,* 393 F.3d at 972 (*quoting Taylor,* 366 F.3d at 1000) (emphasis in original).  Once the federal court is satisfied that the state court's fact-finding process was reasonable or  the petitioner does not challenge such findings, "the state court's findings are dressed in a presumption of correctness, which then helps steel them against any challenge based on extrinsic evidence, i.e., evidence presented for the first time in federal court."[7]  *Taylor,* 366 F.3d at 1000.  *See also* 28 U.S.C. section 2254(e).

Both section 2254(d)(1) and (d)(2) may apply where the petitioner raises issues of mixed questions of law and fact.  Such questions "receive similarly mixed review; the state court's ultimate conclusion is reviewed under [section] 2254(d)(1), but its underlying factual findings supporting that conclusion are clothed with all of the deferential protection ordinarily afforded factual findings under [sections] 2254(d)(2) and (e)(1)."  *Lambert,* 393 F.3d at 978.

**B.  Review of Petitioner's Claims**

**1.  Petitioner's guilty plea (Claims 1 & 2)**

Petitioner alleges that his plea was coerced because the prosecutor threatened to charge Petitioner's girlfriend and alibi witness, Miss Rios, with perjury if she testified at Petitioner's trial. (Petition, p.5) Petitioner also alleges that he entered into the plea agreement based upon the oral promise of a contact visit with Miss Rios and his family members and no such visit was ever permitted.  (Petition, p. 6)

---

[7]Under section 2254(e) "a determination of a factual issue made by a State court shall be presumed to be correct."  "The AEDPA spells out what this presumption means:  State-court fact-finding may be overturned based on new evidence presented for the first time in federal court only if such new evidence amounts to clear and convincing proof that the state-court finding is in error....Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once" it is found  that the state court reasonably determined the facts in light of the evidence presented in the state proceeding. *Taylor,* 966 F.3d at 1000.

a.    The Plea Agreement

On September 29, 2000, Petitioner signed the plea agreement at issue. That agreement includes the following provisions in pertinent part:

10.    **NO OTHER AGREEMENTS:** This written plea agreement contains all the terms and conditions of this plea agreement; and **the Defendant understands that any promises made by anyone, including his attorney, that are not contained within this written plea agreement, are without force and effect, and are null and void. Any prediction or promise as to what the possible sentence will be is understood to be voided by this agreement.**

11.    **DEFENDANT'S AVOWALS:** ....My [the Defendant's] agreement and plea are not the result of force, threats, assurances or promises other than those which are contained in writing in this agreement...

(Answer, Ex. A, p.6) (emphasis in original). Petitioner concedes that the promise of a contact visit was not part of the written plea agreement. (Petition, p.5) Review of the plea agreement reflects no mention of a contact visit or the prosecution's alleged threat of filing perjury charges against Miss Rios.

b. The plea colloquy

The September 29, 2000 plea colloquy reflects that the court established that Petitioner was 26 years of age, read and understood English, and had completed his education through one year of college. (Respondents' October 14, 2005 Notice, Ex.1, p. 1) The court carefully explained the constitutional rights that Petitioner was waiving with entry of the plea. (Id. at pp. 3-5) The trial court specifically inquired whether Petitioner made the decision to waive his right to trial "on your own and in your own free will and free choice?" (Id. at p. 5) Petitioner replied, "Yes." (Id.) The court further inquired:

"Did anybody threaten you or anybody close to you to get you to make a plea agreement?"
MR. LONGORIA: No.
THE COURT: Did somebody promise you something that was different than the plea agreement when you read it?
MR. LONGORIA: No.

- 7 -

(Id. at p.5) The court then discussed the nature of the offenses involved and advised Petitioner in detail about the possible punishment.  (Id. at pp. 6-12, 28-31, 43) The court noted that Petitioner had rejected a previous plea agreement and inquired why Petitioner elected to make a plea bargain at this time  instead of proceeding to trial.  (Id. at p. 22) Petitioner responded:

> Because there is a possibility that I might be released from prison in my normal life.
> THE COURT: You mean under this plea agreement, there is a prospect that you could be alive when you left prison?
> MR. LONGORIA: Yes.
> THE COURT: And the opposite would be that you think that if you were going to trial, that you would end [sic] basically spending the rest of your life in prison?
> MR. LONGORIA: If I'm found guilty, yes.

(Id. at p. 22-23) Petitioner also permitted his attorney, Mr. McCarthy, to discuss the strengths and weaknesses of his case**.**  Mr. McCarthy indicated with regard to the escape charges "[t]here is absolutely no defense in those matters.  There is [sic] a hundred eyewitnesses to that...and his priors are rock solid."  (Id. at p. 25) Although the armed robbery, kidnapping and aggravated assault charges would be "defensible...The State's best piece of evidence is a fingerprint that is on the cash drawer of the store in which Mr. Longoria is alleged to have robbed.  That cannot, under any circumstances, in my mind, be overcome...Mr. Longoria understands that now is [sic] a very strong piece of evidence."  (Id. at pp. 25-26) While Mr. Longoria could present an alibi defense, such defense in Mr. McCarthy's "estimation...would not be absolutely conclusive."  (Id. at p. 26) Mr. McCarthy also pointed out that "[t]here is some concern that Miss Rios, were she to testify inconsistently from what she has told me and [Prosecutor] Mr. Savel, that she could be charged with perjury and that concerns Mr. Longoria; that his girlfriend and companion may go over the line to help Mr. Longoria.  And he's concerned about that as well.  But we have spent many, many hours discussing all of these cases...." (Id.)  Petitioner agreed that his counsel's recitation was "a fair summary." (Id. at p.27) The Court further inquired:

> Since you rejected the [previous] plea agreement, you have rethought what might happen to your companion if she testifies and what she may testify may be attempting to testify falsely?
> Also rethought the State's case, especially in light of the fact they have a fingerprint attributable to you on a piece of evidence [sic] would link you to the robbery and [sic] charge; is that a fair statement?
> MR. LONGORIA: Yes.

(Id.)

Petitioner then entered guilty pleas to several charges.  However, he later indicated that he did not wish to proceed with the plea agreement upon being apprised that there would be an additional consecutive two-year sentence because of the allegation that he  was on release awaiting trial on other matters when the instant offenses were committed.  (Id. at pp. 42-43) When the prosecutor agreed to dismiss that particular allegation, thus removing the additional two-year sentence, Petitioner stated he would proceed with the plea agreement. (Id. at p. 50) Petitioner admitted the factual basis of the charges and indicated that he understood the possible punishment.  (Id. at  pp. 34-42, 50-51)

At the conclusion of the proceeding, the Court found:

> the defendant has made knowing, intelligent and voluntary pleas.
> Based on the discussions I have had with just Mr. Longoria, it seems to me that he has a strong understanding of the consequences, good strong reasoning ability to appreciate the difference in this two-year mandatory added on that we talked about.  He was quick to not only pick it up, but understand the consequence of it.
> So I find that the plea is knowing, intelligent and voluntary.  I accept the plea.

(Id. at p. 52) Thereafter, the prosecutor stated that Petitioner "had some request to see his family and I think that's not only a humane thing to do, I will also follow up with Mr. Blank[8] regarding his medication.  I will do what I can."  (Id. at p. 57)

---

[8]Mr. Blank was the jail commander at the jail where Plaintiff was housed.  (Answer, Ex. F, p. 27)

- 9 -

c.  The June 28, 2002 evidentiary hearing and August 15, 2002 Order

As a result of Petitioner's PCR proceeding, the Arizona Court of Appeals remanded the matter for adjudication of "petitioner's claim that his guilty plea was coerced by improper threats and unfulfilled promises."  (Answer, Ex. E) On June 28, 2002, the trial court held an evidentiary hearing on the matter.  Petitioner represented himself.  Witnesses included: Miss Monica Rios, Petitioner's girlfriend and possible alibi witness; Mrs. Sylvia Longoria, Petitioner's mother; Mr. Dennis McCarthy, Petitioner's trial counsel; Mr. David Savel, the prosecutor during the trial proceeding; and Petitioner himself.

(1.)  Threats

Miss Rios testified that Petitioner told her that he would accept the plea agreement to prevent her from facing perjury charges.  (Answer, Ex. F, pp. 6, 8) Miss Rios further testified that the prosecutor

> didn't threaten to prosecute me for perjury.  He just tried to make it clear what perjury is; tried to make sure I was aware of what that was and how serious it was.
> And I don't know if it was implied, an implied threat, or whatever his intent was...he just made me feel like I wasn't telling the truth.
>
> ***
>
> Q. [prosecutor]:  ...other than giving you the impression that you were not telling the truth, did he discuss specifically the crime or the possibility of prosecuting you for perjury?
> A: [Miss Rios]  Not me, prosecuting me.
> But he was explaining what happened to people that perjure themselves and, you know, everything like that.  So I guess it was up to me to decide was he talking to me, about me, or was he just telling me in general.
>
> ***
>
> Q. [prosecutor]  So he was discussing the possible consequence of perjury?
> A. [Miss Rios]  Right.
> Q.  Be he didn't threaten directly?
> A.  Well,...he didn't threaten me, but he said if you were to lie for him, has he asked you to lie for him.  You know, if you were to lie for him, that would be considered perjury.  And perjury is– you know, he went off and said that.

- 10 -

***

A. [Miss Rios]   His way of questioning was very intimidating and just kind of like...he's more, you know, towards the State's side.  He's not on your side.  But he just made me feel very intimidated.

(Id. at pp. 15-19)

   Mr. McCarthy testified that Petitioner had informed him of a rumor that the prosecutor would prosecute Miss Rios for perjury if she testified.  (Id. at pp. 24-25) Miss Rios' mother, who was a court employee, expressed her concern to Mr. McCarthy "about Miss Rios testifying falsely and being subject to perjury."  (Id. at p. 36) Mr. McCarthy discussed with Miss Rios the meaning of perjury and the consequences of giving false testimony at trial.  (Id. at p. 39; *see also* Id. at pp. 50-51) When asked whether Miss Rios indicated that the prosecutor had made threats to her about perjury charges, Mr. McCarthy responded:

I don't recall– I wouldn't use the word threats, I would use the word concern.  But not necessarily from [Prosecutor] Mr. Savel, just concern about providing false testimony.

***

Q.: [prosecutor]:  And in all of that information, did you conclude that Miss Rios had been threatened with perjury?
A: [Mr. McCarthy]: No, I didn't believe there was a threat.

(Id. at pp. 40-42) The court also questioned Mr. McCarthy as to whether Petitioner expressed that he would not have accepted the plea "but for the belief that Miss Rios might be charged with perjury...?" (Id. at p. 48) To which Mr. McCarthy responded, "No. He was concerned...I wouldn't characterize it as major.  But, now if memory serves me, he had concerns, Judge." (Id.) Mr. McCarthy indicated  that even with Miss Rios' testimony, there was no probability of success at trial because of the forensic evidence and he expressed the same to Petitioner.  (Id. at pp. 48-49) Mr. McCarthy testified that Petitioner decided to accept the plea offer because:

You [Petitioner] were concerned about the evidence against you; that the fingerprint evidence, specifically, was powerful evidence against you.

- 11 -

> And you were concerned about spending the rest of your life in the Department of Corrections.
>      And you made certain statements to that effect and that was after conversations that we've had and gone over the reports and all that.  And you had decided to accept the plea agreement.

(Id. at pp. 28-29)

Mr. Savel's testimony included his reasons for not believing Miss Rios.  He testified that Miss Rios changed her statement "enough to where I felt that her credibility was very, very weakened, if not destroyed entirely."  (Id. at p. 72) He also "...basically confronted her with the fact that we had a problem" because the information she had given him during interviews was "directly" contradicted by "very strong physical evidence."  (Id. at p. 73) If he believed that Miss Rios gave false testimony during Petitioner's trial, Mr. Savel "would have definitely pursued perjury charges against" her.  (Id. at pp. 64-65)

Petitioner testified that he signed the plea agreement because he "felt the threat of them charging Miss Rios was a lot more than I wanted her to go through."  (Id. at p. 101) According to Petitioner, his attorney was aware of this but "didn't want me to speak on it and...to say something wrong that you wouldn't accept the plea agreement."  (Id. at p. 102)

(2.)  Contact Visit

Miss Rios testified that Petitioner told her that he would be allowed a contact visit with her and Petitioner's mother as part of the plea agreement.  (Id. at p. 9) No such visit with Miss Rios ever occurred.  (Id. at p.10)

Mr. McCarthy testified that Petitioner requested a contact visit.  (Id. at p. 31) Mr. McCarthy "believe[d]" that he had spoken to the jail commander about Petitioner's request because such visit required the commander's approval. (Id. at pp. 31-32) Mr. McCarthy denied that he had indicated to Petitioner that the contact visit "was agreed to when" Petitioner signed the plea agreement.  (Id. at p. 32).  Mr. McCarthy testified that he had explained to Petitioner that the jail commander, the prosecutor and the court would have to approve such a visit and that "it wasn't made part of the plea agreement."  (Id. at p. 43; *see also* Id. at p. 32)

Mr. Savel testified that "he never promised that" a contact visit would happen.  (Id. at p. 68) He did relay Petitioner's request to the jail commander.  (Id.)  "I don't think it was part of the plea agreement.  I think that was kind of a personal request that Mr. Longoria desired....It clearly wasn't in the written" plea agreement.  (Id. at pp. 77-78) Mr. Savel did not make any promises to Petitioner or defense counsel that Petitioner would receive a contact visit.  (Id. at p. 78) "If any promise was made, it was that I would make the request.  And that was all I was willing to do at the time."  (Id.)

(3.)  August 15, 2002 Order

Subsequent to the evidentiary hearing, the trial court denied Petitioner's PCR Petition.  (Answer, Ex. G)  Although the trial court indicated that it's denial was based upon review of the transcript of the June 2002 evidentiary hearing, the court made no findings of fact or conclusions of law in its order.  (Id.)

d.  The appellate court's decision

Petitioner filed a petition for review of the trial court's August 15, 2002 order denying his PCR Petition.  On October 28, 2003, the Arizona Court of Appeals granted review but denied relief.  (Answer, Ex. H)   The appellate court held that assuming Miss Rios' "version of the events as true, there was no prosecutorial misconduct...even if the possibility of [Miss Rios'] being charged with perjury was a material consideration in petitioner's decision to plead guilty versus taking his case to trial, the prosecutor did not threaten [Miss Rios] and did not undermine the validity of the plea by explaining to [Miss Rios] the possible consequences of giving false testimony."  (Id. at p. 3)

The appellate court also held that based upon the transcripts of the plea proceeding and the evidentiary hearing, a contact visit "was not part of the plea agreement itself, and whether any such visit actually occurred would ultimately be a decision made by the authorities at the county jail.  Accordingly, because petitioner did not establish that the state had guaranteed him a contact visit as a term of the plea agreement, the fact that no such visit later occurred could not have affected the validity of the guilty pleas."  (Id. at pp. 3-4)

- 13 -

e.  Analysis

"A habeas petitioner bears the burden of establishing that his guilty plea was not voluntary and knowing."  *Little v. Crawford,* 449 F.3d 1075 (9th Cir. 2006) (*citing Parke v. Raley,* 506 U.S. 20, 31-24 (1992)).   The United States Supreme Court has defined the standard "as to the voluntariness of guilty pleas" as follows:

> [A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled promises or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady v. United States,* 397 U.S. 742, 755 (1970) (citations omitted).  *See also Boykin v. Alabama,* 395 U.S. 238, 242-242 (1969) (for guilty plea to be voluntary and knowing, the defendant must be aware of the nature and elements of the charges against him, the constitutional rights he is waiving, and the possible punishment he faces).  The defendant's "'[s]olemn declarations in open court carry a strong presumption of verity.'" *Little,* 449 F.3d at 1081 (*quoting Blackledge v. Allison,* 431 U.S. 63, 74 (1977)). Voluntariness is determined from the totality of the circumstances.  *Brady,* 397 U.S. at 749.

The record herein reflects that at the change of plea proceeding Petitioner was fully advised of his constitutional rights; the charges against him, and the consequences of his plea.  He affirmed in writing by signing the plea agreement and orally during the plea colloquy that:  (1) he was not entering the plea because of threats directed at him or someone close to him; and (2) no one promised him something different from what was contained in the plea agreement.  Although he did express concern that Miss Rios could be charged with perjury if she testified at trial, Petitioner also indicated that he wished to enter a guilty plea upon consideration of the strength of the State's evidence against him and the fact that under the terms of the plea agreement, he would not spend the rest of his life in prison which could otherwise happen if he were found guilty at trial.

Petitioner's argument that he entered the plea solely because of an alleged threat of perjury charges directed at Miss Rios is undercut by his decision during the plea colloquy to vacate the proceeding and instead go to trial when he was apprised that there would be an additional two-year sentence imposed for one of the charges.  Petitioner continued with the plea only after the prosecutor dismissed that particular charge.  (*See supra* at p.9) Additionally, testimony from the June 28, 2002 evidentiary hearing, including testimony from Miss Rios, establishes that the prosecutor never threatened to prosecute Miss Rios if she testified.  Rather, Miss Rios felt intimidated when she was made aware of the definition and consequences of perjury and that the prosecutor believed her statement was contradicted by other evidence. Petitioner took this into consideration, in addition to other factors including the strength of the State's case and possible length of imprisonment, when deciding to accept the plea offer and enter his guilty plea.  Nothing on the instant record suggests that Petitioner's guilty plea was induced by threats directed at Miss Rios.

There is no evidence in the record that contact visits were part of the plea agreement. Petitioner specifically affirmed to the court that there were no promises made to him different from the terms of the plea agreement.  A contact visit is not mentioned in the plea agreement nor in the plea colloquy by the court, the prosecutor, defense counsel, or Petitioner himself as a term, condition, or promise relating to the plea agreement.  The  prosecutor stated at the conclusion of the plea proceeding that he would relay to jail authorities Petitioner's request to see his family.  Defense counsel testified at the June 28, 2002 evidentiary hearing that prior to signing the plea agreement, Petitioner was advised that a contact visit was not "made part of the plea agreement."  (Answer, Ex. F, p. 43) On the instant record, Petitioner has not established that a contact visit was a term of the plea agreement.

For the foregoing reasons, the Arizona appellate court's determination that Petitioner's plea was knowing and voluntary was neither contrary to, nor an unreasonable application of, clearly established federal law.  Nor did the state court's proceeding result in a decision that was based on an unreasonable determination of the evidence presented.

## 2.  Petitioner's claim concerning the evidentiary hearing (Claim 3)

Petitioner argues that with regard to the June 28, 2002 evidentiary hearing, he was denied the ability to prepare "a defense, lack of meaningful access to legal material or assistance by person trained in law." (Petition, p. 7) He asserts that his request to interview witnesses prior to the hearing was denied; and had he been able to conduct interviews, he would have subpoenaed other witnesses whose testimony would have supported his claim.

When Petitioner raised this claim with the Arizona appellate court, the court held:

> Petitioner affirmatively sought to represent himself in this matter...The trial court appointed advisory counsel to assist him in issuing and serving subpoenas and gave petitioner free reign and wide latitude to question witnesses at the hearing.  Petitioner did not complain at that time about his inability to have interviewed the witnesses beforehand and has failed to demonstrate that he was prejudiced by the lack of such an opportunity.  We find he is not entitled to any relief in this regard.

(Answer, Ex. H, p.4)

A habeas corpus petition must allege a deprivation of a federal right to present a cognizable federal habeas corpus claim.  *See Estelle v. McGuire,* 502 U.S. 62, 68 (1991); *Franzen v. Brinkman,* 877 F.2d 26 (9th Cir. 1989).  Claim 3 of the Petition herein does not allege a deprivation of a federal right.  Thus, Claim 3 should be dismissed.

To any extent that Petitioner's claim may be construed as a challenge regarding the process employed by the state court to arrive at its factual findings, "mere doubt as to the adequacy of the state court's findings of fact is insufficient." *Lambert,* 393 F.3d at 972.  To hold that the state court's fact-finding process was inadequate,  this court must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in concluding that the state court's process was adequate.  *Id.*  The federal court "must be particularly deferential to" the state court.  *Id.*

Petitioner asserts that "Mr. Savel and Mr. McCarthy couldn't recall the visit agreement during" the evidentiary hearing.  (Petition, p.7) According to Petitioner, had he been permitted to interview these witnesses prior to the hearing, he would have called others to

testify that he entered the plea in order to receive a contact visit and that prior plea negotiations involved a contact visit.

The record reflects that Petitioner was granted the opportunity to subpoena witnesses to testify regarding the issue of a contact visit and that he had assistance of advisory counsel in doing so. Petitioner was permitted wide latitude in his questioning of Mr. Savel and Mr. McCarthy. Both were clear in their testimony that although they indicated that they would make an effort to arrange a contact visit, such a visit was not part of the plea agreement. Likewise, neither the written plea agreement nor the transcript of the trial court's plea colloquy included any provision regarding a contact visit as part of the plea or the plea agreement. During the plea colloquy Petitioner affirmed that no promises had been made "different" from the plea agreement. (Answer, Ex. I, p.5) Under the instant circumstances, the state court's fact-finding process was adequate. Therefore, Petitioner's claim does not alter this Court's conclusion with regard to Petitioner's Claims 1 and 2 discussed, *supra,* at pp. 6-15.

## III.  RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court deny Petitioner's Petition for Habeas Corpus (Doc. No. 1).

Pursuant to 28 U.S.C. §636(B), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: **CV 04-521-PHX-JWS.** A party may respond to another party's objections within ten days after being served with a copy thereof. *See* Fed.R.Civ.P. 72(b).

If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be deemed waived. *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

The Clerk of Court is directed to send a copy of this Report and Recommendation to the parties and/or their counsel.

DATED this 20th day of October, 2006.


_____
Héctor C. Estrada
United States Magistrate Judge